**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

I.H., by his legal guardian, D.S.,     :
                                       :
            Plaintiff,                 :     No. 1:11-CV-574
                                       :
     v.                                :     Hon. John E. Jones III
                                       :
CUMBERLAND VALLEY SCHOOL:
DISTRICT,                              :
                                       :
            Defendant.                 :

## MEMORANDUM

### July 20, 2012

## I.    INTRODUCTION

Presently pending before the Court are the Motion for Partial Judgment on the Administrative Record (Doc. 39) of the Plaintiff, I.H., by his legal guardian, D.S., and the Motion for Judgment on the Administrative Record or in the Alternative for Summary Judgment (Doc. 36) of the Defendant, Cumberland Valley School District. The Motions have been fully briefed (Docs. 38, 45, 48, 40, 44, 47) and are thus ripe for our review. For the reasons that follow, we will grant in part and deny in part each party's Motion and remand the case to the Hearing Officer for further proceedings consistent with this opinion.

## II.   PROCEDURAL HISTORY

This is a civil action brought by the Plaintiff, I.H. ("Student"), by his legal

guardian, D.S. ("Plaintiff" or "Guardian"), against the Defendant Cumberland Valley School District ("District" or "Defendant") and District Superintendent William Harner ("Harner") to appeal the decision of a Pennsylvania Special Education Hearing Officer ("Hearing Officer") after a due process hearing and decision under the Individuals with Disabilities in Education Act ("IDEA"). Plaintiffs commenced the above-captioned action by filing a Complaint on March 25, 2011. (Doc. 1). In the Complaint, Guardian, on behalf of the Student, seeks additional compensatory education above that awarded by the Hearing Officer, attorneys fees, and additional relief that the Court finds appropriate.

On July 26, 2011, the District filed a Motion to Dismiss (Doc. 14). Briefing on said motion was held in abeyance while the parties attempted mediation, which was ultimately unsuccessful. The motion was fully briefed (Docs. 23-25) and on February 8, 2012, we issued an opinion granting in part and denying in part the District's Motion to Dismiss. *See I.H. v. Cumberland Valley Sch. Dist.*, 2012 U.S. Dist. LEXIS 15215 (M.D. Pa. Feb. 8, 2012). In that opinion, we dismissed claims against Defendant Harner on qualified immunity grounds, dismissed the Plaintiff's claims in Count C and D for relief under the Americans with Disabilities Act ("ADA") and Section 1983, respectively, for failure to state a claim, and held that the IDEA's statute of limitations bars Plaintiff's claims predating June 8, 2008.

(*Id.*). We denied the motion, however, to the extent Defendant's sought dismissal of Plaintiff's prospective request for an Individualized Education Program ("IEP") and concluded that IDEA does not relieve a district of its obligation to provide resident students with an IEP, particularly where the student unenrolls due to the district's perceived failure to provide free appropriate public education ("FAPE") and related services in the first instance.

Defendant filed an Answer with affirmative defenses on March 19, 2012. (Doc. 31). In its Answer, the Defendant raised a Counterclaim, alleging error in the Hearing Officer's award of compensatory education beyond January 6, 2010. (*Id.*). The Plaintiff failed to answer the Defendant's counterclaim, and pursuant to Federal Rule of Civil Procedure 8(b)(6), the Plaintiff is deemed to have admitted all allegations therein. *See* Fed. R. Civ. P. 8(b)(6).

On May 1, 2012, Plaintiff filed a Motion for Partial Judgment on the Administrative Record (Doc. 39) and the Defendant filed a Motion for Judgment on the Administrative Record or in the Alternative for Summary Judgment. (Doc. 36). The Motions have been fully briefed (Docs. 38, 45, 48, 40, 44, 47) and are thus ripe for our review. For the reasons fully articulated herein, we will grant in part and deny in part both motions and remand the case to the Hearing Officer for further proceedings consistent with the within opinion.

## III.   STATEMENT OF MATERIAL FACTS

The following factual summary is derived from the parties' statements of material fact and the administrative record. At this juncture, both the parties and the Court are intimately familiar with the relevant facts in this undeniably complex litigation. Accordingly, we shall herein briefly summarize the pertinent facts as derived from the administrative record and supplement them as necessary with additional facts throughout our analysis.[1]

Plaintiff I.H. ("Student") is a middle school student with disabilities who resides with his grandmother and guardian, D.S. ("Guardian") in the Cumberland Valley School District ("Defendant" or "District") in the Middle District of Pennsylvania. (Doc. 37, ¶¶ 1, 3). Student was enrolled in the District from the beginning of the 2006-2007 school year, Student's third grade year, through the end of the 2009-2010 school year, his sixth grade year. (*Id.* ¶ 2). Guardian enrolled Student in a public cyber charter school ("Agora") beginning September 15, 2010, and Student has remained enrolled at Agora since that time. (*Id.*). It is uncontested that the Student is eligible for special education services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. (*Id.* ¶ 3).

---

[1] This Court has previously decided (Doc. 26) that the applicable statute of limitations bars the Plaintiffs' claims arising before June 8, 2008. Accordingly, we will limit our discussion of events preceding the summer of 2008, but nonetheless include the same where we deem their recitation relevant.

Throughout the duration of the Student's education with the District, both his Guardian and the District noted his behavioral problems, which were largely attributed to his impulsivity. (Doc. 37, ¶ 32; Doc. 46, ¶ 53; Doc. 21-2, ¶ 3). In May of 2007, at the Guardian's request, the Student was evaluated by the District. (Hearing Officer Decision ("HOD"), FOF ¶ 4). The report noted that the Student fell in the "average" range in all math sub-tests, but had considerable deficiencies in his full scale IQ, reading, and writing abilities. (*Id.* FOF ¶ 5). Student's teacher rated him just outside the clinically significant range on the Scale for Assessing Emotional Disturbance, but nonetheless expressed concerns about his emotional state affecting his performance and that of others. (*Id.* FOF ¶ 6).

Both the Student's teacher and his Guardian reported that the Student complained of voices telling him to do "bad things" and that he sometimes wanted to hurt himself. (*Id.*). The report ultimately concluded that the Student is a child with a disability, with a primary disability listed as "Emotional Disturbance" and a second category as "Other Health Impairment." (*Id.* FOF ¶ 8). Guardian approved the report and an Individualized Education Program ("IEP") was issued; Student began receiving special education services from the District at the beginning of the 2007-2008 school year. (*Id.*).

During the 2008-2009 school year, Student was reevaluated at Guardian's

request. (*Id.* FOF ¶ 12). Guardian shared additional diagnostic information with the District, including a report from Dr. Jose Montaner, a psychiatrist, who concluded that Student suffered from Asperger's Syndrome and associated social interaction deficits. (*Id.* FOF ¶ 12; Doc. 37, ¶ 26; Doc. 46, ¶ 26). The revised report notes that the Student had been diagnosed with Attention Deficit Disorder ("ADD"), Post-Traumatic Stress Disorder ("PTSD"), Anxiety, and Pervasive Developmental Disorder ("Asperger's Syndrome"). (*Id.*). Despite repeated reports from the Guardian that the Student needed up to two-and-one-half hours per evening to complete his math homework, and notwithstanding the revised diagnoses, the District evaluators did not change Student's eligibility classifications nor amend his IEP to include math goals or accommodations. (Doc. 37, ¶ 26; Doc. 46, ¶ 26).

Student's IEP team convened on January 8, 2009, to review the Student's IEP based on the new evaluation. (Doc. 37, ¶ 35; Doc. 46, ¶ 35). The IEP provided that the Student requires assistive technologies and that he exhibits behaviors which impede Student's learning and that of others. (Doc. 37, ¶ 36; Doc. 46, ¶ 36). The IEP includes a behavioral plan and notes that the Student has sensory difficulties; it also documents his then-recent Asperger's Syndrome diagnosis. (*Id.*). The IEP did not consider or plan for Extended School Year ("ESY") services for the summer of 2009. (Doc. 37, ¶¶ 43-45). The January 2009 IEP included a

writing goal, two emotional support goals, an organizational goal, and a social skills goal, in addition to an extensive list of modifications and specially designed instruction ("SDI") considerations. (*Id.*). The IEP noted that the student has strong math abilities and average reading ability, but that he avoids writing. (*Id.*).

Throughout the remainder of the 2008-2009 school year, while the January 2009 IEP was being implemented, Guardian frequently contacted Student's teachers to express concern about Student's math and organizational skills. (Doc. 37, ¶ 38; Doc. 46, ¶ 38). Guardian testified that she would frequently spend up to two-and-one-half hours per night helping Student with his homework, but that her complaints to the district were of no avail. (Doc. 37, ¶ 37).

The beginning of the 2009-2010 school year marked the Student's sixth-grade year and his transition to Good Hope Middle School, his neighborhood school. (*Id.* ¶ 46). Guardian stated that the Student became very overwhelmed in this new setting. (*Id.*). On September 8, 2009, the IEP team reconvened to discuss revisions to the January 2009 IEP. (*Id.* ¶ 47). Because of the Student's apparently heightened emotional needs, the District increased the time spent in emotional support services to two to three thirty (30) minute sessions per six-day cycle. (*Id.*). The IEP team also removed a math accommodation from the IEP, added while he was attending elementary school, which provided that the Student was to complete

only half of the assigned math homework problems. (*Id.*).

The revised September 8, 2009 IEP provided for itinerant learning support, where the learning support teacher was "pushed into" the Student's regular classroom for social studies, science, and writing class. (*Id.* ¶ 48). Per that IEP, the Student would receive assistance with his organizational skills and writing in the learning support classroom. (*Id.*). The Student's time spent in the learning support classroom increased in the fall of 2009 from two (2) hours to approximately five (five) hours per week. (Doc. 46, ¶ 48).

During the fall of 2009, the District moved the Student to a lower-level math class; District staff testified that they believed that the Student was too advanced for this lower-level course, but had agreed to place Student in this class solely to acquiesce to the Guardian's demands. (Doc. 37, ¶ 52). Guardian testified that she was spending almost four (4) hours per night assisting the Student with his homework at this point, and that the District's sole response to her requests for help was, instead of modifying the amount of math homework, to place him in a lower level course. (Doc. 46, ¶ 52).

Student contracted swine flue approximately one month after the September 2009 IEP was initially implemented and, as a result, was absent from school from October 19, 2009 through October 29, 2009. (Doc. 37, ¶ 54). After his return to

school, and to some extent prior to his absence, Student exhibited substantial

symptoms of stress, and a gastroenterologist diagnosed him with "a condition in

which the Student's physical reaction to stress caused esophageal spasms, which

caused a small blood vessel to rupture, which caused the Student to spit up blood."

(*Id.* ¶ 55). On November 11, 2009, the Student informed his emotional support

teacher that he would like to "end it all;" as a result, an emergency meeting

attended by Guardian, the school principal, and the emotional support teacher

convened. (*Id.* ¶ 56). The Student's IEP was amended to provide that the Student

would temporarily be relieved from homework assignments, other than studying

for tests, and would no longer have Chinese class. (*Id.*). On November 24, 2009,

the District and the Guardian agreed to a change in the Student's schedule,

providing that he would spend the first four periods of each day in the special

education classroom to further catch up on missed work. (*Id.* ¶ 57). Guardian

testified that she agreed to this change only because she was "ready to give up" and

did not know how to help the Student. (Doc. 46, ¶ 57).

On December 2, 2009, the District issued a new reevaluation report which

indicated that the Student would benefit from placement at Hill Top Academy

("Hill Top"), a partial hospitalization program operated by the Capital Area

Intermediate Unit ("CAIU"). (*Id.* ¶ 58). Based on this report, on December 4, 2009,

the Student's IEP was revised to place the student in a half-day program. (*Id.*). This report was determined to be inappropriate by a hearing officer in a prior proceeding because it failed "markedly" to take into account Student's present status and difficulties and instead was virtually identical to the 2008 evaluation report. (*Id.*). At a January 6, 2010 IEP meeting, it was agreed that the Student's placement should be changed to Hill Top Academy. (Doc. 37, ¶ 69). Guardian testified that she only agreed to this placement because she believed the Student would receive one-on-one attention and therapeutic services at Hill Top. (Doc. 46, ¶ 69). Prior to deciding on the Hill Top placement, the District considered whether placement in a learning support classroom at its Eagle View Middle School or at Student's neighborhood Good Hope Middle School would be appropriate. (Doc. 37, ¶ 71).

Guardian testified that Student experienced such emotional trauma during his first two days at Hill Top that she felt compelled to immediately remove him. (*Id.* ¶¶ 73-75; Doc. 46, ¶¶ 73-75).[2] Staff at Hill Top believed that it was actually the

---

[2] According to the Guardian, the Student reported after his second day that: "the teacher shut the door to the classroom to keep out a student who the day before had thrown a chair at someone" and that "the student kept banging on the door, cursing and swearing, until she was taken away;" that a ninth grader assigned to Student's classroom "smuggled a pin into the class" and told Student that he was "going to use the pin to slit [his] throat, steal what was in his pockets, take his shoes and leave him to die" and that the teacher stated that if she did not hear it, it did not happen; and that when Student went to the school nurse because he was throwing up blood and advised the nurse that he was not okay, she replied "Good." (Doc. 46, ¶ 74). The only evidence

Guardian who was struggling with the transition. (*Id.*). Upon removing Student from Hill Top, the Student was evaluated by Dr. Valentins Krecko, who prescribed homebound instruction for the following thirty (30) days. A second prescription extended homebound instruction through May 15, 2010. The Student received five (5) hours per week of one-on-one instruction with a special education teacher throughout the duration of the homebound instruction. (Doc. 37, ¶ 80). While the Student did not receive reading instruction, (Doc. 46, ¶ 80), Guardian testified that the homebound instruction was "wonderful" and that she was quite satisfied with the teacher and the instruction received. (Doc. 37, ¶ 81; Doc. 46, ¶ 81).

Despite the homebound instruction prescription, the District reconvened an IEP meeting for March 18, 2010; the meeting had been scheduled for January 1, 2010, but was rescheduled to accommodate the schedules of the Guardian's and the District's attorneys. (Doc. 37, ¶ 83). The District retained a private clinical psychologist for this meeting to discuss and develop plans for transitioning the Student back to school from homebound instruction. (*Id.* ¶ 85). The District noted at that meeting that it envisioned placing Student in an emotional support program at its Eagle View Middle School for the 2010-2011 school year. (*Id.* ¶ 87). It did

_____

of record supporting these allegations is Guardian's testimony. Guardian dismisses the fact that no Hill Top staff noticed, documented, or reported these incidents to them "remain[ing] oblivious." (*Id.* ¶ 75).

not revise his IEP to reflect this plan at any time during the 2009-2010 school year or the summer of 2010. (Doc. 46, ¶ 87). On March 22, 2010, the District offered a "transition plan" to Guardian which would effectuate Student's transition to its Eagle View Middle School; the Guardian rejected the proposed transition plan and Student continued to receive homebound instruction for the remainder of the year. (Doc. 37, ¶ 88; Doc. 46, ¶ 88).

Guardian enrolled the Student in a public cyber charter school ("Agora") on August 18, 2010 to begin the 2010-2011 school year. (Doc. 37, ¶ 98). Student's official enrollment date was September 15, 2001. (*Id.* ¶ 99). On September 14, 2010, the District's IEP team for the Student again met to review the Student's then-current IEP and make changes to the IEP based upon the report of Alan Babcock, an evaluator privately obtained by the Guardian. (Doc. 37, ¶ 101). The District finalized the IEP and presented it to the Guardian, who declined to accept it on September 28, 2010. (*Id.*). The Guardian contends that the September 2010 IEP, proposing placement in the emotional support classroom at the District's Eagle View Middle School, is inappropriate and does not meet the Student's needs. (Doc. 46, ¶ 101).

## IV.   STANDARDS OF REVIEW

## A.    JUDGMENT ON THE ADMINISTRATIVE RECORD

Where a party appeals from a due process complaint arising under the Individuals with Disabilities Education Act ("IDEA"), the district court applies a standard of review different from that applied in summary judgment motion practice. Once an aggrieved party initiates a civil appeal from the administrative due process determination, the IDEA provides that the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).[3] This statutory language has resulted in a "modified version of de novo review," obliging the district court to "give due weight to the factual findings of the [hearing officer]." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006).

The Supreme Court, in announcing the applicable standard of review, admonished that the preponderance of the evidence standard of review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review." *Bd. of Educ. v.*

---

[3] Neither party here has moved the court for permission to submit additional evidence. Instead, the parties have moved for disposition on the administrative record alone.

13

*Rowley*, 458 U.S. 175, 206 (1982).  This "nontraditional standard of review" requires the Court to "give 'due weight' to the findings of the state hearing officer." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, ___ (3d Cir. 2012) (quoting *Rowley*, 458 U.S. at 206). The Third Circuit has further expounded upon this explanation, holding that the "[f]actual findings from the administrative proceedings are to be considered prima facie correct" and that, in the event the district court determines not to adhere to those findings, the court is "obliged to explain why." *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).

### B.    SUMMARY JUDGMENT

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there

is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact finder could draw therefrom. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the

mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477 U.S. at 247-48.

## V.   HEARING OFFICER'S DECISION

On December 25, 2011, after two consolidated hearings and reviewing the record evidence provided by both parties, the Hearing Officer issued his decision. The Hearing Officer awarded compensatory education to the Student in the following amounts for the following periods of time: twenty-four (24) hours of compensatory education for the summer of 2009; one-half hour of compensatory education for each hour that the District was in session between December 4, 2009 and January 6, 2010; and one hour of compensatory education for each hour that the District was in session between January 6, 2010 and the conclusion of the 2009-2010 school year.

With respect to the 2008-2009 school year, the Hearing Officer found that the Student was not substantively denied a FAPE and that the Guardian had failed to meet her burden of proving that the Student did not receive appropriate educational services from the District. He concluded that all parties recognized Student's needs in written expression and organization and that the District's

services were designed to address those needs. Further, the Hearing Officer found the District's testimony about Student's math abilities to be credible and consistent with objective assessments, thus rejecting the Guardian's contention that failure to include a math goal and accommodations in the IEP was a substantive denial of the Student's right to FAPE. He concluded that while "progress monitoring during the 2008-2009 school year left much to be desired, and it is clear that the Guardian was both concerned and frustrated about the Student's progress as she perceived it, the record does not reveal a substantive denial of FAPE during this time." (Doc. 21-2, p. 14).

Regarding the summer of 2009, the Hearing Officer found that the District failed entirely to consider the potential need for Extended School Year ("ESY") services for Student, and that this failure resulted in a denial of FAPE. The Student was thus awarded compensatory education "in an amount equal to the services offered in the summer of 2010 (24 hours) to compensate for the District's failure to even consider" the Student's ESY needs in the summer of 2009. (*Id.*, p. 15).

Finally, the Hearing Officer determined that the District denied Student a FAPE during part of the 2009-2010 school year. The Hearing Officer found that the Student's transition to middle school was difficult for him, and that the District thus had an appropriate rectification period to address and adjust to the Student's

heightened emotional support needs. Further, he found that the Student was absent due to illness for a substantial period of time in October of 2009, thus delaying the District's efforts. He concluded that there is "no preponderant evidence that the District could have or should have done anything else for the Student from the start of the 2009-2010 school year until the emergency meetings in November of 2009[.]" (*Id.* p. 15). He went on to conclude that while the District's attempts to address Student's needs in November of 2009 were "ad hoc and haphazard" but nonetheless declined to award compensatory education in light of the District's entitlement to a reasonable rectification period. (*Id.*).

Finally, the Hearing Officer agreed with Guardian that all programming from December 4, 2009 to January 6, 2010 was *per se* inappropriate because the District's decisions were based on an evaluation which was previously found to be inappropriate. (*Id.*). Further, the Hearing Officer determined that the District failed to consider any less restrictive alternatives to Hill Top, and that it had made no systematic effort to return Student to school from homebound instruction, and thus the Hearing Officer awarded compensatory education from January 6, 2010 through the end of the 2009-2010 school year.

## V. DISCUSSION

With the overlay of this Court's prior decision dismissing several of the Plaintiff's claims, the only remaining causes of action at this juncture are the Plaintiff's IDEA claims for an appropriate IEP and compensatory education beyond that awarded by the Hearing Officer, Plaintiff's Section 504 claims alleging discrimination, and the Defendant's IDEA counterclaim, seeking a partial reversal of the hearing officer's award of compensatory education. We will first address the cross-motions as they relate to the Plaintiff's IDEA claim and the Defendant's IDEA counterclaim and then proceed to analyzing the Defendant's Motion for Summary Judgment as it relates to Plaintiff's claim under Section 504.

**A.    IDEA Claims**

Both the Plaintiff and the Defendant have moved for judgment on the administrative record as it relates to the Hearing Officer's IDEA conclusions. Specifically, Plaintiff seeks an order declaring that the District's IEP is prima facie inappropriate and insufficient for IDEA purposes and an award of compensatory education above and beyond that awarded by the Hearing Officer. The Defendant seeks a declaration that the Plaintiff's IEP request is moot because an IEP for the 2010-2011 school year has already been offered. The Defendant further seeks a reversal of the Hearing Officer's award of compensatory education beyond January 6, 2010. We first address the Plaintiff's IDEA claim with regard to the IEP that the

District offered to the Student in September of 2010.

### 1.    The District's September 2010 IEP

Our memorandum opinion deciding the District's Motion to Dismiss (Doc. 26) left open the issue of whether the IEP offered by the District to the Plaintiff on September 28, 2010 was appropriate. There, we limited our discussion of the issue to the question specifically raised by the parties: whether a district can be required, pursuant to the IDEA, to provide an IEP to a student residing in the district but who has since unenrolled in the district and enrolled in a cyber charter school, thus making the charter school its Local Education Agency ("LEA") for purposes of the IDEA. We concluded, based partly on the rationales of the tuition-reimbursement cases, that the District is indeed required to provide the Student with an IEP upon request, reasoning that to require a student to re-enroll in his school district of residence as a prerequisite to receiving an IEP from said district, particularly where said district's initial inadequacies were the reason for unenrollment in the first instance, would be both illogical and inconsistent with the remedial nature of the IDEA. (Doc. 26, p. 21).

While noting its disagreement, the District does not reargue this point in its motion for summary judgment. Instead, the District contends that despite our prior ruling that the Plaintiff may proceed with a claim requesting an appropriate IEP,

the Plaintiff's claim is moot because an IEP was in fact both offered to, and rejected by, the Student. The District asserts, and Plaintiff concedes, that the District offered Student an IEP on September 28, 2010, and that the same took into account the private evaluations of the Student and offered the Student placement in the District's Eagle View Middle School in an emotional support class for part of the day. (Doc. 37, ¶ 17). Plaintiff responds that the IEP ultimately does not satisfy the District's obligation under the IDEA because it is not reasonably calculated to afford some educational benefit.

We disagree with the District's apparent contention that its obligation as established by our prior Order is satisfied by the mere provision of an IEP. The offering of merely any IEP is insufficient to satisfy the District's IDEA obligations, and regardless of the charter school's status as the Student's LEA, the District must nonetheless provide an IEP which meets the minimum substantive standards of the IDEA. That is, the IEP must be "reasonably calculated" to afford some "educational benefit" to the student. *Mary Courtney T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 249 (3d Cir. 2009) (quoting *Rowley*, 458 U.S. at 207) ("When parents challenge [the adequacy of] a school's provision of a [free and appropriate public education] to a child, a reviewing court must (1) consider whether the school district complied with the IDEA's procedural requirements and (2) determine

whether the educational program was 'reasonably calculated to enable the child to receive educational benefits.'").

Critically, however, and as both parties note, the Hearing Officer did not issue findings of fact or conclusions of law with respect to the appropriateness of the IEP offered by the District in September of 2010. A core dispute amongst the parties is what types of services and support were considered in formulating the IEP and the effect of those services on Student's education. Accordingly, as to this issue, we will remand the case to the Hearing Officer for further proceedings as necessary to formulate findings of fact and conclusions of law as to whether the IEP offered to the Student in September of 2010 is reasonably calculated to enable the child to receive educational benefits. *See, e.g.*, *Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 799 F. Supp. 2d 473, 491 (E.D. Pa. July 29, 2011).[4]

### 2.    Compensatory Education

---

[4] The District argues that because neither the September 14, 2010 nor the September 28, 2010 IEP would be applicable to date even if the Student did re-enroll in the district, the Plaintiff's claim regarding either is now moot. We note only briefly that this argument has been flatly rejected by the United States Supreme Court. *See Rowley*, 458 U.S. at 186 n.9 ("Judicial review invariably takes more than nine months to complete, not to mention the time consumed during the preceding state administrative hearings. The District Court thus correctly ruled that it retained jurisdiction to grant relief because the alleged deficiencies were capable of repetition as to the parties before it yet evading review."); *see also Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985) (noting that review of IDEA claims is "ponderous" and that "[a] final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by the IEP has passed"). We decline the District's poorly-disguised invitation, unsubstantiated by either law or argument, to summarily reject the decisions of the Supreme Court.

Defendant also moves for judgment on the administrative record on Plaintiff's claims seeking additional compensatory education for the time period from June 8, 2008 until January 6, 2010, and on its own counterclaim seeking reversal of the hearing officer's award of compensatory education beyond January 6, 2010. Plaintiff has likewise moved for disposition on the administrative record relative to these claims. We will first address Plaintiff's claim for compensatory education for the time period between June 8, 2008 and January 6, 2010, and then proceed to discussing the Defendant's counterclaim.

### i.      June 8, 2008 through January 6, 2010

The District asserts that this Court should affirm the Hearing Officer's decision as it relates to Student's education during the time period prior to January 6, 2010, disputing Plaintiff's contention that the Hearing Officer's decision is in error and that an award of additional compensatory education is warranted. We note preliminarily this Court has already decided that the statute of limitations bars the Student's claims prior to June 8, 2008, and thus we consider only the limited time period between June 8, 2008 and January 6, 2010. (Doc. 26, p. 27). Based on a review of the record, we conclude that the Hearing Officer's decision is well-supported by law and fact and we thus decline the Plaintiff's invitation to award further compensatory education than was awarded by the Hearing Officer. We will

grant the District's Motion with respect to this issue, deny the Plaintiffs' Motion, and enter judgment as a matter of law on Plaintiff's claim in Count A to the extent Plaintiff seeks additional compensatory education.

### a.    The Student's Fifth Grade Year

In *Board of Education v. Rowley*, 458 U.S. 176 (1982), the Supreme Court held that Congress's intention with the IDEA was to "open the door of public education to handicapped children on appropriate terms." *Id.* at 192. At the same time, however, the Court warned that the Act does not necessarily "guarantee any particular level of education." *Id.* A school district has satisfied its burden under the IDEA's mandate of a free, appropriate public education ("FAPE") when the following two questions are answered in the affirmative: "First, has the [school district] complied with the procedures set forth in the act? And second, is the individualized educational program developed through the act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* at 206-07. Our inquiry today lies within the second prong of this test.

Regarding Plaintiff's fifth-grade year, the 2008-2009 school year, the Hearing Officer did not find a "substantive denial of [Student's] right to FAPE." (Doc. 21-2 (citing *P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 739 (3d Cir. 2009)). After reviewing the record, the Hearing Officer found

that the Plaintiff had failed to meet her burden of proving that the Student did not receive appropriate educational services during the 2008-2009 school year. Specifically, he concluded that while both Plaintiff and the District recognized Student's needs in the areas of written expression and organization, the District had provided appropriate services to address those needs.

The Hearing Officer likewise considered the District's services provided in math and concluded that while there was no reason to doubt the Plaintiff's testimony that the Student struggled with math homework, there was no evidence that the Student's performance in math at school was affected. He further concluded that while the informal progress monitoring during Student's fifth grade year "left much to be desired, and it is clear that the [Plaintiff] was both concerned and frustrated about the Student's progress as she perceived it," the objective evidence of record demonstrates neither action nor inaction amounting to a substantive denial of FAPE. (*Id*. at p. 14*).

The District, in formulating its argument, largely reiterates the Hearing Officer's decision and urges this Court to conclude that it did not substantively deny the Student a FAPE during the 2008-2009 school year. Plaintiff, on the other hand, asserts that the District failed to provide Student with a FAPE during the 2008-2009 school year and that the Hearing Officer's decision with respect thereto

is thus entirely in error. In making this argument, Plaintiff contends that the

District failed to provide a FAPE for several reasons, but notably fails to cite

record evidence to support these arguments.[5] Instead, Plaintiff outlines what she

_____

[5] Specifically, Plaintiff claims the following actions and inactions amount to a substantive denial of FAPE:

> (1)    The failure to develop a Functional Behavioral Analysis and a Behavioral Support Plan based on such an analysis, despite the finding in the 2006 Initial Evaluation that [Student] needed such support.
>
> (2)    The failure to provide adequate behavioral support, including identification of measurable target behaviors, hypothesis formulation and testing, data collection, oversight to assure that the plan was implemented with fidelity and revision of the plan as soon as such revision is indicated.
>
> (3)    The failure to provide appropriate interventions for [Student's] severe executive processing deficits, including specifically the failure to teach [Student] skills in organization and planning.
>
> (4)    The failure to provide appropriate interventions to develop [Student's] pragmatic language skills.
>
> (5)    The failure to provide adequate training in social skills.
>
> (6)    The failure to provide adequate instruction in writing.
>
> (7)    The failure to provide adequate assistive technology.
>
> (8)    The failure to acknowledge [Student's] deficits in mathematics and to teach him the skills needed to overcome those difficulties, and the removal of [Student's] mathematics homework accommodations at the beginning of [sixth] grade when he needed that accommodation more than ever.
>
> (9)    The inappropriate scheduling changes and reduction of the school day without considering more appropriate interventions.

(Doc. 40, pp. 35-36). We note only briefly that while the Hearing Officer did find that several of these same issues warranted an award of compensatory education during other time periods, Plaintiff has entirely failed to cite to preponderant evidence of record establishing these failures during the complained-of 2008-2009 school year.

believes is the optimal educational program for the Student and broadly asserts, again without citation or support, that failure to provide any or all of these programs and services is the failure to develop a plan reasonably calculated to provide an educational benefit and thus, in turn, a substantive denial of FAPE.

Critically, and for good reason, in analyzing whether a particular student was denied his or her right to a FAPE, our inquiry is not one grounded in hindsight and retrospect but instead in review of the school district's decisions at the time they were made; indeed, the Third Circuit has expressly proscribed "Monday Morning Quarterbacking" in IDEA cases. *See Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1991) ("[T]he measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date.").

The record admittedly demonstrates that the District's progress monitoring and the services provided were not *optimal*, but optimal services and entirely satisfactory results are not the measuring stick for a FAPE. *See Carlisle Area Sch. v. Scott P. by and through Bess P.*, 62 F.3d 520, 533-34 (3d Cir. 1995) ("Districts need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a 'basic floor of opportunity.'"). The standard is virtually minimal, indeed, "modest." *See, e.g.*,

*A.B. v. Lawson*, 354 F.3d 315, 350 (4th Cir. 2004) ("IDEA's FAPE standards are far more modest than to require that a child excel or thrive.") (citing *Rowley*, 458 U.S. at 206-07. In sum, our duty here is to consider whether the services offered and provided are "sufficient to confer some educational benefit." *Rowley*, 458 U.S. at 200.

The Guardian's arguments here, as they were before the Hearing Officer, are largely based on evaluations of the Student by two doctors, Dr. Alan Babcock, a psychiatrist, who evaluated Student on June 9, 2010, and Dr. Richard Dowell, a neuropsychologist, who evaluated Student in 2010. Critically, neither of these doctor's evaluations occurred contemporaneously with the complained of 2008-2009 school year. Instead, these evaluations, retrospectively opining as to what the District should have done, represent precisely the type of Monday Morning Quarterbacking proscribed by the Third Circuit. *See Fuhrmann*, 993 F.2d at 1040.

The Hearing Officer concluded that while the District's program may not have been subjectively satisfactory to the Guardian, it nonetheless objectively satisfied the IDEA's modest standard of "confer[ring] some educational benefit." The Guardian may disagree, but mere disagreement with the Hearing Officer's conclusions, absent substantiated allegations of error, is insufficient to support reversal of the hearing officer's decision in a motion for judgment on the

administrative record. On the administrative record before us, we must affirm the

decision of the Hearing Officer and conclude that the District did not fail to

provide a FAPE to the Student during the 2008-2009 school year and that the

Student is thus not entitled to compensatory education for that time period.

### b.    The Student's Sixth Grade Year

Plaintiff next contends that the District failed to provide the Student with a

FAPE during his sixth-grade year, particularly the first part of that year. Plaintiff

thus asserts that Student is entitled to an award of compensatory education from

the beginning of the 2009-2010 school year until December 4, 2009, when the

Hearing Officer's award of compensatory education begins. Both parties have

moved for judgment on the administrative record with respect to this claim. As

with the previous claim, we again find no error in the Hearing Officer's declination

to award additional compensatory education for this time period.

The record establishes that September of 2009, which marked the beginning

of the 2009-2010 school year and the Student's transition to middle school, was

accompanied by significant adjustment difficulties. As with the previous claim, the

parameters of the Plaintiff's specific arguments are unclear, and she makes broad

allegations of failure to provide services specific to both general and specific skills

without citing to particular evidence or outlining a particular time period. Instead,

Plaintiff contends that the District failed to provide student with a laundry list of necessary services and programs, *see supra* note 3, but cites to no record evidence demonstrating that the Hearing Officer's conclusions regarding the services actually provided were in fact in error.

Distilling the record and untangling Plaintiff's arguments, the Hearing Officer found that credible testimony supports that Student was struggling significantly with the transition to middle school and that his "increased needs were obvious." He further noted that upon recognition of and reaction to these needs, the District's response was "ad hoc and haphazard." However, the Hearing Officer noted, quite appropriately, that a school district is permitted a reasonable period of time to assess a student's difficulties and develop a plan which responds to the student's altered or heightened needs. *See M.C. on behalf of J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996). Given the nature and significance of the Student's difficulties, and especially in light of the fact that the Student was absent for a large part of the month of October, we must agree with the Hearing Officer that the delay in the District's response was within a "reasonable rectification period" to which they are entitled. *See id.*

Plaintiff does not address the District's point regarding the reasonable rectification period but instead narrowly contends that Student is entitled to

compensatory education because the District failed, in the fall of 2009, to provide Student with a FAPE. Plaintiff relies on the Hearing Officer's findings regarding Student's "obvious" needs and the District's "ad hoc and haphazard" response and contends that the same necessarily demonstrate a denial of FAPE. However, Plaintiff entirely ignores the District's sound argument, and the Hearing Officer's proper determination, that the District is permitted a reasonable rectification period in which to recognize, address, and service a student's needs. Because Student was out of school with an illness for a large part of the month of October, and because the District reasonably responded to the Student's heightened emotional needs in November shortly after Student's return from medical absence, we cannot find as a matter of law that the District was unreasonable in its failure to provide FAPE during the early part of the 2009-2010 school year.[6]

## ii.   Beyond January 6, 2010

The Hearing Officer awarded Student compensatory education for the time

---

[6] Defendant asserts in its brief that Plaintiff's claim for compensatory education for the "summer of 2008" is meritless and time-barred. (Doc. 38, pp. 15-16). Plaintiff in her Complaint only vaguely requests as damages an award of "additional compensatory education" above and beyond that awarded by the Hearing Officer. (Doc. 1). It was not until the cross-motions for summary judgment that the parameters of Plaintiff's request were expounded upon in sufficient detail for the Court to rule. Plaintiff apparently only seeks an additional award of compensatory education for the entire fifth grade school year (2008-2009 school year) and for the beginning of the sixth grade school year (2009-2010 school year) until December 4, 2009. (Doc. 45, pp. 12-13, 15-16). Compensatory education for the summer of 2008 is not requested and not at issue, and thus we need not address this argument.

period beginning January 6, 2010 and continuing until the end of the 2009-2010 school year. In its Answer to the Plaintiff's Complaint, the District filed a Counterclaim, seeking reversal of the Hearing Officer's decision and contending that the Hearing Officer erred in making this determination. (Doc. 31). Plaintiff failed to respond to the Defendant's counterclaim.

Defendant asserts that Plaintiff's failure to respond to the Counterclaim necessarily requires that all allegations contained therein are deemed admitted pursuant to Federal Rule of Civil Procedure 8(b)(6). Plaintiff concedes in her reply brief in support of her own motion that she has entirely failed to file a pleading responding to the Defendant's Counterclaim. (Doc. 47, p. 21). Instead of moving for leave to answer, albeit untimely, Plaintiff merely contends that her opposition brief constitutes a sufficient response to the Counterclaim's allegations and that the Defendant suffers no "prejudice" by her failure to answer the Counterclaim. (*Id.*).

Notably, Rule 8(b)(6) does not contemplate the existence or lack of prejudice nor does it indicate that its requirements are waived by subsequent response to allegations in dispositive motion practice. Instead, the rule requires a responsive *pleading*: "[a]n allegation–other than one relating to the amount of damages–is admitted if a responsive pleading is required and the allegation is not denied." Fed. R. Civ. P. 8(b)(6). Accordingly, the allegations of error in the

Defendant's Counterclaim must be deemed to be admitted by this Court pursuant to the controlling rules of procedure. It follows, therefore, that the Plaintiff has effectively conceded that the judgment below was in error and the award of compensatory education from January 6, 2010 through the end of the 2009-2010 school year must be reversed. We will thus grant the Defendant's Motion for Summary Judgment on its Counterclaim.[7]

## B.      Section 504 Claim

In Count B, Plaintiff seeks relief pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), contending that the District denied to Student, on the basis of the nature and degree of severity his disability, the opportunity to participate in and benefit from federally-assisted

---

[7] While a merits analysis is not required of us in light of Plaintiff's failure to answer the Defendant's counterclaim, we note only briefly that the portion of the Hearing Officer's decision reviewing the District's efforts in the spring of 2010 does appear to contain several errors of fact providing independent grounds for reversal. The Hearing Officer concluded that the District failed to consider less restrictive alternatives prior to placing Student in the partial hospitalization program, *see Oberti v. Bd. of Educ.*, 995 F.2d 1204 (3d Cir. 1993), and that it further failed to address the Student's needs and make a systematic effort to return the Student to school from homebound instruction. The record shows that the District considered placement at its Eagle View Middle School prior to placement in the Hill Top program, and at least one individual testified that the Student's neighborhood school was likewise considered. Further, the record indicates that during the spring of 2010, the District hired a private psychologist who met on multiple occasions with the Student's IEP team, Guardian, and the Student himself to develop a "transition plan" to return the Student to school, but that the plan was rejected by the Student's Guardian. (Doc. 37, ¶¶ 82-88; Doc. 46, ¶¶ 82-88). While we do not render a decision on the merits, we predict that the ultimate outcome would nonetheless result in judgment in the District's favor.

educational services, programs, and activities and discriminated against him on the basis of the same. The District has moved for judgment on the administrative record or for summary judgment on this claim.[8]

Section 504 provides that "[n]o otherwise qualified individual with handicaps in the United States . . . shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To prevail on his Section 504 claim, Plaintiff must prove the following elements: (1) that he is disabled as defined by the Rehabilitation Act; (2) that he is "otherwise qualified" to participate in school activities; (3) that the school district receives federal financial assistance; and (4) that he was excluded from participation in, denied the benefits of, or subject to

---

[8] As a threshold matter, we briefly address the Defendant's contention that Plaintiff's failure to raise her Section 504 arguments in her opening brief in support of her motion for summary disposition constitutes a waiver of that claim in its entirety. (Doc. 44, p. 38 ("Plaintiff's Motion and Brief are devoid of any reference to Section 504 [and] . . . [b]ecause Guardian fails to address such claims in her dispositive motion, and because the claims are inextricably tied to her FABE-based claims, the claim is waived."). Defendant cites *Laborers International* for the proposition that "[a]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court." *See Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994). Notably, however, that principle was applied by an appellate court referring to appellate briefing and is entirely inapplicable here, where a movant before a trial court moves, entirely within her right, for *partial* judgment on *part* of her claims. Accordingly, the Section 504 arguments are not deemed waived merely because the Plaintiff has elected not to move for summary disposition thereon.

discrimination at the school. *Centennial Sch. Dist.*, 799 F. Supp. 2d at 488-89. The

plaintiff does not need to prove "that the district's allegedly discriminatory acts

were intentional," *id.* at 489, however, the record must contain some evidence

demonstrating "that the [school district] acted *on the basis of* [the student's]

disability." *See Eric H. by his parents John and Janet H. v. Methacton Sch. Dist.*,

265 F. Supp. 2d 513, 523 (E.D. Pa. Feb. 13, 2003).

The Hearing Officer did not address the Plaintiff's Section 504 claims, and

we thus review the Motion as one for summary judgment as opposed to one for

judgment on the administrative record. The District contends that, even construing

the record in favor of the Plaintiff as we must in addressing a motion for summary

judgment, the evidence nonetheless fails to support Plaintiff's claim pursuant to

Section 504. The District contends that no record evidence supports the Plaintiff's

claims and that the Plaintiff has thus failed to present sufficient evidence to create a

genuine issue of fact with respect to her claim.  Plaintiff seems to contend that

because she has stated a "prima facie case" in her Complaint and would prefer to

take the Section 504 claim to trial, the Court must deny the Defendant's Motion

seeking judgment on the Section 504 claim.[9] Plaintiff's election not to move for

---

[9] Specifically, Plaintiff responds that she "elected to file a motion for *partial* disposition on the
record, . . . leaving [Student's] claims arising under Section 504 of the Rehabilitation Act for
trial." (Doc. 47, p. 20).

summary disposition of the Section 504 claim, however, does not relieve her

burden of responding to the Defendant's Motion for judgment on the same. The

Plaintiff must nonetheless respond to the Defendant's Motion, which asserts an

entire lack of evidence supporting the Section 504 allegations, and present

evidence to this Court supporting her claim. Fed. R. Civ. P. 56(e)(2).

Apparently in an attempt to survive summary judgment on this claim, the

Plaintiff broadly asserts that "considerable evidence of record" supports that the

student has disabilities, lives in the District, and was excluded from school, denied

certain benefits, and unnecessarily segregated on the sole basis of his disabilities.

(Doc. 45, p. 26). While our prior Order (Doc. 26) notes that such an allegation was

sufficient for purposes of surviving the District's motion to dismiss, much more is

required of the Plaintiff at this stage of the proceedings. *See* Fed. R. Civ. P.

56(e)(2) (Non-moving party "may not rely merely on allegations of denials in its

own pleadings;  rather, its response must . . . set out specific facts showing a

genuine issue for trial."). As we so often remind litigants, bare assertions and

conclusory allegations unaccompanied by citation to substantiating evidence are

insufficient to survive summary judgment.

The Plaintiff in her brief—and likewise in her responsive statement of

facts—fails to submit any evidence or argument to this Court demonstrating that

the District has discriminated against the Student or otherwise denied him a benefit

solely on the basis of his disability. Indeed, she fails to point to a single statement,

document, or other piece of evidence in support of her contention that the Section

504 claim must survive for trial. As abovestated, the non-moving party cannot

"rely on unsupported allegations, but must go beyond the pleadings and provide

some evidence that would show that there exists a genuine issue for trial." *Jones*,

214 F.3d at 407. Accordingly, we will grant summary judgment on the Plaintiff's

Section 504 claim in favor of the Defendant.[10]

## VI.   CONCLUSION

For all of the reasons articulated herein, we will grant in part and deny in

part both Motions and remand the case for further proceedings before the Hearing

Officer consistent with this opinion. An appropriate Order shall issue.

---

[10] Defendant raises the additional argument that this Court must dismiss Plaintiff's claim for expert fees under the IDEA and Section 504 because such fees are not permitted by either section. We note initially that this Court has already concluded, and Plaintiff does not contest, that the IDEA does not support an award of expert fees. (Doc. 26). Accordingly, this is a moot issue. Further, we feel compelled to point out that, while we herein have dismissed Plaintiff's Section 504 claim, we remind the Defendant that had the same prevailed, its allegation that expert fees are not recoverable under Section 504 is a question of law, not of fact, which was thoroughly considered and rejected both in its initial Motion to Dismiss and again in its Motion for Reconsideration. We decline the Defendant's third invitation to hold that expert fees are not recoverable in an action under Section 504. The same are expressly contemplated by Section 504's inclusion of all remedies available under Title VI of the Civil Rights Act, which explicitly includes expert witness fees.